## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

REYNALDO MILLETTE,

   Petitioner,

-vs-            Case No. 8:18-cv-2232-WFJ-SPF

SECRETARY, DEPARTMENT
OF CORRECTIONS,

   Respondent.

_____/

### <u>ORDER</u>

  Mr. Millette, a Florida prisoner, initiated this action by filing a petition for the writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 1) challenging convictions for first-degree murder, robbery, and false imprisonment. Respondent filed a response opposing the petition (Doc. 6) to which Petitioner replied (Doc. 11). Upon consideration, the petition will be denied.

## I. BACKGROUND AND PROCEDURAL HISTORY

  Mr. Millette had been staying at the Siesta Inn but was told to leave by the victim (the proprietor of the motel) (Doc. 15-2, Ex. 29, docket pp. 58-59). He and the victim had an argument, and the police were called (Id., docket p. 59). As Mr. Millette was leaving, he said he was going to get his money back (Id., docket p. 60). A few days later, the victim was found dead at the Siesta Inn's front office from blunt trauma to his head (Doc. 6-2, Ex. 1, docket pp. 15-16). Because the victim's wallet

and money from the office were missing, it was apparent he was killed during a robbery (Id.). During the robbery and homicide, the victim's mother was bound with duct tape (Id.). Petitioner Millette's DNA (and not the co-defendant's) was discovered on two pieces of the duct tape. His co-defendant's, Benjamin Rogers, DNA was found under the victim's fingernails and on the door of the motel office (Id.).[1] The evidence was that Petitioner and his co-defendant were acquaintances.

At the conclusion of his trial, Mr. Millette was found guilty of first-degree felony murder, robbery, and false imprisonment (Id., docket pp. 121-22). He was sentenced to life in prison (Id., docket pp. 147-53).[2] His convictions and sentences were affirmed on appeal (Doc. 6-6, Ex. 6).

Mr. Millette, through counsel, filed a motion under Rule 3.850, Fla.R.Crim.P., alleging ineffective assistance of trial counsel (Id., Ex. 11). He filed an amended Rule 3.850 motion (id., Ex. 12), and a second amended motion (Id., Ex. 14). Grounds 1, 2, 4, 6, 7, and 8 were summarily denied (Id., Ex. 28), and Grounds 3 and 5 were denied following an evidentiary hearing (Id., Ex. 25). The denial of the second amended Rule 3.850 motion was affirmed on appeal (Id., Ex. 26).

---

1 Mr. Rogers was tried separately.

2 The Court takes judicial notice of information on the Florida Department of Corrections Offender Network, http://www.dc.state.fl.us/offenderSearch/detail.aspx?, that indicates Mr. Rogers likewise was convicted of first-degree murder, robbery, and false imprisonment and sentenced to life in prison. Rule 201, Fed.R.Evid.

Mr. Millette filed his federal habeas petition in this Court alleging ten grounds for relief (Doc. 1).

## II. GOVERNING LEGAL PRINCIPLES

Because Mr. Millette filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003). The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

## A. Standard of Review Under the AEDPA

Under the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

3

28 U.S.C. § 2254(d). The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Secretary for Dep't of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id.*

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A determination of

4

a factual issue made by a state court, however, shall be presumed correct, and the

habeas petitioner shall have the burden of rebutting the presumption of correctness

by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. §

2254(e)(1).

## B. Standard for Ineffective Assistance of Counsel

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668

(1984), established a two-part test for determining whether a convicted person is

entitled to relief on the ground that his counsel rendered ineffective assistance: (1)

whether counsel's performance was deficient and "fell below an objective standard of

reasonableness"; and (2) whether the deficient performance prejudiced the defense.

*Id*. at 687-88. A court must adhere to a strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance. *Id*. at 689-90.

"Thus, a court deciding an actual ineffectiveness claim must judge the

reasonableness of counsel's challenged conduct on the facts of the particular case,

viewed as of the time of counsel's conduct." *Id*. at 690; *Gates v. Zant*, 863 F.2d 1492,

1497 (11th Cir. 1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective

assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is
> the test even what most good lawyers would have done. We ask only
> whether some reasonable lawyer at the trial could have acted, in the
> circumstances, as defense counsel acted at trial. Courts also should at

> the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted).

Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

## C. Exhaustion of State Remedies and Procedural Default

Before a district court can grant habeas relief to a state prisoner under § 2254, the petitioner must exhaust all state court remedies that are available for challenging his conviction, either on direct appeal or in a state post-conviction motion. *See* § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A state prisoner "'must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting *O'Sullivan*, 526 U.S. at 845.)

To exhaust a claim, a petitioner must make the state court aware of both the legal and factual bases for his claim. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass on and correct alleged violations of its prisoners' federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (alteration in original)). A federal habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State...if he has the right under the law of the State to raise, by any available procedure, the question presented." *Pruitt*, 348 F.3d at 1358. The prohibition against raising an unexhausted claim in federal court extends to both the broad legal theory of relief and the specific factual contention that supports relief. *Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004).

The requirement of exhausting state remedies as a prerequisite to federal review is satisfied if the petitioner "fairly presents" his claim in each appropriate state court and alerts that court to the federal nature of the claim. 28 U.S.C. § 2254(b)(1); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). A petitioner may raise a federal claim in state court "by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such claim on federal grounds, or simply by labeling the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F. 3d 695, 703 (11th Cir. 1999). *See also Murray v. Carrier*, 477 U.S. 478 (1986). To show prejudice, a petitioner must demonstrate not only that the errors at his trial created the possibility of prejudice but that they worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimensions. *United States v. Frady*, 456 U.S. 152 (1982). The petitioner must show at least a reasonable probability of a different outcome. *Crawford v. Head*, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

Alternatively, a petitioner may obtain federal habeas review of a procedurally defaulted claim if review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Carrier*, 477 U.S. at 495-96. A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "'[A]ctual innocence'

means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). To meet this standard, a petitioner must show a reasonable likelihood of acquittal absent the constitutional error. *Schlup*, 513 U.S. at 327.

## III. ANALYSIS

**Ground One:   TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO CALL A WITNESS WHO WOULD HAVE PROVEN THE REASONABLE HYPOTHESIS OF INNOCENCE PRESENTED BY THE DEFENSE. THIS VIOLATED THE PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS GUARANTEED BY THE UNITED STATES CONSTITUTION. (PRECEDENT *STRICKLAND v. WASHINGTON*, 466 U.S. 668 (1984)) (Doc. 1, pp. 7-9)**

Mr. Millette contends trial counsel was ineffective in failing to call Veronica Perry to testify at trial. Ms. Perry, according to Mr. Millette, would have testified: 1) Mr. Millette was home with her each night since he left the Siesta Inn on March 15, 2008, including the night of the murder; 2) Mr. Millette was the one who called the police after the victim asked him to leave the Siesta Inn (which would have supported the evidence that he held no animosity toward the victim); 3) she had never seen Mr. Millette with the co-defendant Mr. Rogers; 4) she noticed a roll of duct tape was missing from her house after Mr. Rogers had been at her house to buy drugs from her neighbors a few days before the murder; and 5) before the roll of duct tape had gone missing, Mr. Millette had used it to affix a temporary license plate to a vehicle. This testimony, Mr. Millette argues, would have explained why his DNA was on the duct tape and created reasonable doubt in the minds of the jury.

This claim was raised in state court in Ground Five of Mr. Millette's second amended Rule 3.850 motion (Doc. 6-6, Ex. 14, docket pp. 175-77). In denying the claim after the evidentiary hearing, the state post-conviction court stated:

> Defendant alleges in Ground Five that his attorney was ineffective for failing to call at trial Veronica Perry, a girlfriend with whom he resided at the time of the crime. Counsel gave notice that Perry was an intended defense witness, and Perry gave a deposition on March 6, 2009, three days prior to the start of trial. Defendant asserts that Perry was available to testify, and that had she been called as a witness, she would have testified to the fact that Defendant lived with her and that he was home on the night that the crimes were committed; Defendant once used a roll of duct tape at Perry's house to affix a vehicle tag to an automobile, thus explaining why his DNA was found on duct tape; co-defendant Benjamin Rogers likely took the roll of duct tape from Perry's home while present on an occasion when he bought drugs from Perry's neighbors; Perry had never seen Defendant with Rogers; and Defendant had been the one to call the police when he became involved in a dispute with the murder victim four days prior to date of the robbery.
>
> "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses of conduct have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." *Occhicone v. State*, 768 So. 2d 1037, 1048. Where counsel has made a reasonable investigation of a witness and makes decisions based on that investigation, such as the decision not to call that witness at trial, those decisions are presumed to be reasonable and strategic and "virtually unchallengeable." *Mendoza v. State*, 81 So. 3d 579, 581 (Fla. 3rd DCA 2012) (quoting *Strickland*, 466 U.S. at 690). A defendant can rebut this presumption only by demonstrating that "*no* competent counsel" would have made the same decision. *Id.* (quoting *White v. State*, 729 So. 2d 909, 912 (Fla. 1999) (emphasis in original).
>
> The Court found in its July 20, 2016, order that neither Perry's deposition, nor Defendant's colloquy at the close of the State's case, was sufficient to summarily deny the claim on the record, because there was inadequate evidence to demonstrate that counsel had abandoned Perry as a defense witness for strategic reasons.

A. Evidentiary Hearing Testimony

**(1) Testimony of Defendant**

Defendant testified that he was arrested some months after the robbery occurred, and that he contacted counsel for representation based upon a referral from Veronica Perry. When counsel informed Defendant that State investigators had found his DNA on duct tape at the crime scene, Defendant could not think of any reason to explain this fact. He never gave Perry's name to his attorney as a potential defense witness. Perry went to see counsel of her own accord, and counsel listed her on the Defendant's Witness List. Defendant and Perry remained in contact by telephone after his arrest and discussed "everything"; however, the two never discussed how Defendant's DNA could have been transferred to the duct tape at the scene of the crime. After he was adjudicated guilty and sentenced, Defendant learned that Perry had been deposed prior to trial, and he obtained a copy of the deposition transcript. Reading the transcript reminded him as to how he had once used duct tape at Perry's home to affix a license plate to his vehicle, which would explain how his DNA was deposited on the duct tape. Counsel never discussed the Perry deposition with Defendant. At the time of trial, Defendant was under the belief that there were no defense witnesses, and he understood counsel's strategy was to question when the DNA was deposited on the duct tape, rather than how the State could have misidentified Defendant as the source of the DNA. Had Defendant known that Perry was a potential alibi witness, he would not have told the Court, after the State rested its case, that he was comfortable with not putting on any evidence.

**(2) Testimony of Trial Counsel**

Counsel testified that Veronica Perry contacted him about representing Defendant in this matter because he had represented some of her acquaintances in the past. Defendant never told him that Perry was a potential witness; however, counsel later learned that Perry was in a relationship with Defendant, and that she might be able to provide testimony relevant to the case. Counsel spoke with Perry periodically and listed her as a defense witness even though he ultimately did not call her at trial. His decision not to take any depositions was a function of time, in that Defendant did not wish to waive his speedy trial right;

11

and case complexity, in that the facts of the case were not very intricate and the State had turned over all of its discovery. He had Defendant sign an acknowledgement that he refused to waive speedy trial. He did not file a notice of alibi in response to the State's demand because he did not believe that there was evidence to support this defense.

Counsel participated in the State's deposition of Veronica Perry, and after hearing her testimony, he believed that calling her as a witness would have done more harm than good. Perry would have tied Defendant more closely to Benjamin Rogers, the co-defendant, and brought before the jury evidence that Defendant, Perry, and Rogers used drugs, sometimes with each other. Her testimony also established no alibi because Perry had no specific recollection as to where Defendant was at the time of the robbery. Her testimony as to Defendant's whereabouts at that time were speculative, and they related to seeing something on a TV newscast. She could have told the jury that Defendant once used some tape-possibly duct tape-from her house in order to affix a license tag to a car, but she was not certain about which tape Defendant used. There was no one to link Perry's duct tape with the crime scene duct tape, and counsel did not want the jury to know that Rogers had access to Perry's house. Counsel kept the option of calling Perry open during trial and had her remain in the courthouse hallway in case she was needed. While he could not recall discussing with Defendant whether to call Perry, he said it would have been his practice to let his client ultimately make that decision. Counsel said he went to the jail to discuss Perry's deposition prior to trial. While he could not recall if he received a copy of the deposition transcript, if he had, he would have provided a copy to Defendant.

Based on his discussions with Defendant, counsel was unaware of any other witness who might have possessed helpful information to the case. Both counsel and Perry attempted to locate a girl named Dasia, but they were unable to do so. Counsel's trial strategy was to portray Defendant as uninvolved in the entire incident based upon the fact that the surviving victim said she only saw and heard one man--a man with spikey hair--during the robbery. Defendant did not have a spiked hairstyle either before or on the day of the robbery, and counsel brought out this fact on cross-examination of law enforcement officers.

**(3) Testimony of Veronica Perry**

12

Veronica Perry testified that she gave a deposition prior to the date of Defendant's trial. She believed that in her deposition she said that Defendant was home with her on the night of the crime. She based this on the fact that Defendant spent every night at her home from the time he moved out of the hotel, until Easter, and the robbery occurred between this time span. Perry affirmed at the hearing that Defendant was home with her on the night of the robbery. On one occasion prior to the date of the robbery, she saw Defendant use duct tape to secure a paper license plate to his car. She noticed that a roll of duct tape from her home later went missing, and she did not know what happened to it. She could not say if Defendant used her tape. Defendant was seeing another woman, Nicole, while he lived with Perry; and a third woman, Dasia, lived with Perry and Defendant.

B. Finding

Counsel made a reasonable investigation of Veronica Perry. He had continuing contacts with Perry up until the time of trial, attended her deposition, and had her remain outside the courtroom during the trial in case her testimony was needed. While Perry could have testified to her belief that Defendant was home with her on the night of the robbery, she would have had to explain that she based her belief on Defendant's routine of staying home at night and doing drugs. Her testimony concerning the duct tape could have provided a reason that Defendant's DNA would be on duct tape located in her home, but she provided no testimony that she saw someone take the duct tape. Had she testified that Rogers visited her home while Defendant lived there, suggesting that Rogers took the tape, this would have provided a link between the two men that the State did not present in its case in chief. The jury also would have learned that Perry, herself, was drinking and using drugs during this time period, casting doubt on her ability to accurately recollect the events.

In light of these considerations, counsel's decision not to call Perry-a witness who could at best have provided an incomplete alibi, and at worst given very prejudicial testimony-was an objectively reasonable strategic decision made after a deliberation of alternate courses of action. *See Deparvine v. State*, 146 So. 3d 1071, 1084 (Fla. 2014) (finding counsel's performance not deficient for failing to call witness who could potentially provide damaging testimony, would be

13

impeached on cross-examination, and lacked credibility); *Evans v. State*, 995 So. 2d 933, 943-44 (Fla. 2008) (finding counsel's performance not deficient for failing to present incomplete alibi witnesses, witnesses with questionable credibility, and witnesses with incomplete memories); *White v. State*, 964 So. 2d 1278, 1288 (Fla. 2007) (finding counsel's performance not deficient for failing to present witness who committed prior homicide with defendant, and who had questionable credibility). Though the strategy was ultimately unsuccessful, counsel's decisions are not measured by how present counsel would have proceeded in hindsight. *See Reynolds v. State*, 99 So. 3d 459, 483 (Fla. 2012); *Cherry v, State*, 659 So. 2d 1069, 1073 (Fla. 1995); *Souffrant v. State*, 994 So. 2d 407, 410-11. (Fla. 3d DCA 2008).

Defendant's argument that counsel actually foreclosed the possibility of calling Perry by failing to file a notice of alibi, so that he had no alternative course but to forego Perry's testimony, is unpersuasive. A defendant's duty to respond to the State's demand for a notice of alibi by no later than 10 days prior to trial arises only where the defendant "intends to offer evidence of an alibi in defense." See Fla. R. Crim. P. 3.200. Counsel testified at the hearing that he didn't believe that Perry could provide an alibi, so that he would not be offering her testimony for that purpose. Defendant's disagreement with counsel's assessment of Perry's testimony does not make counsel's performance deficient. *See State v. Hannon*, 941 So. 2d 1109, 1119, 1121 (Fla. 2006).

Moreover, Defendant's testimony-that he was only reminded of the time when he used duct tape to affix a license plate after reading Perry's deposition-strains credulity. It is also belied by other testimony. Defendant stated that he and Perry remained in regular communication by phone after his arrest, and they discussed "everything," though he said that this specifically excluded discussions as to how his DNA got onto the crime scene tape. Counsel testified that he discussed Perry's deposition testimony with Defendant prior to trial, and that it was his routine practice to allow his clients to make the ultimate decision as to whether to call a witness. And finally, Defendant told the Court, after the State rested its case, that he agreed not to present any evidence on his own behalf. This affirmation was made while Petry remained in the courthouse, ready to give testimony. As Perry lived with Defendant at the time of the robbery and remained in contact with him after his arrest, it does not strike the Court as plausible that Defendant would not have known that she could give helpful testimony in these matters.

14

For all of the foregoing reasons, Ground Five shall be denied.

(Doc. 6-6, Ex. 25, docket pp. 268-75). The state appellate court affirmed the denial of the second amended Rule 3.850 motion without elaboration (Doc. 6-6, Ex. 26).[3]

To establish a claim of ineffective assistance of counsel, courts "should always presume strongly that counsel's performance was reasonable and adequate." *Atkins v. Singletary*, 965 F. 2d 952, 958 (11th Cir. 1992). And "a court should be highly deferential to those choices ... that are arguably dictated by a reasonable trial strategy." *Devier v. Zant*, 3 F.3d 1445, 1450 (11th Cir. 1993). "[C]omplaints about uncalled witnesses are not favored, because the presentation of testimony involves trial strategy and 'allegations of what a witness would have testified are largely speculative.'" *Shaw v. United States*, 729 F. App'x 757, 759 (11th Cir. 2018) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)). And choosing which witnesses to call "is the epitome of a strategic decision, and it is one that ... will seldom, if ever, [be] second guess[ed]." *Rhode v. Hall*, 582 F.3d 1273, 1284 (11th Cir. 2009).

---

3 *See Rogers v. Sec'y, Dep't of Corr.*, 829 F. App'x 437, 441 (11th Cir. 2020) ("When the state court does not explain its decision, the federal habeas court 'should look through the unexplained decision' to the last reasoned state-court decision and presume that the unexplained decision adopted that same reasoning." *Wilson v. Sellers*, —— U.S. ——, 138 S. Ct. 1188, 1192, 200 L.Ed.2d 530 (2018).

Here, the state post-conviction court determined trial counsel's decision to not call Ms. Perry to testify "was an objectively reasonable strategic decision made after a deliberation of alternate courses of action." That determination was not objectively unreasonable, considering Ms. Perry's deposition testimony, and her and trial counsel's testimony during the evidentiary hearing on Mr. Millette's second amended Rule 3.850 motion.

Trial counsel testified he decided to not call Ms. Perry as a witness because her testimony would have provided more evidence that Mr. Millette and Mr. Rogers knew each other, and evidence they used drugs together (Doc. 15-2, Ex. 30, transcript p. 49). Moreover, he believed her alibi testimony was weak because she could not definitively say Mr. Millette was with her at the time of the offenses (Id., transcript p. 50). And her testimony was not very helpful in explaining how Mr. Millette's DNA was on the duct tape used to restrain the victim's mother (Id., transcript pp. 50-51). Ultimately, trial counsel decided Ms. Perry's testimony "would do more harm than good." (Id., transcript p. 51). He therefore made a strategic decision to not call her to testify (Id., transcript p. 52).

Counsel's decision was reasonable because Ms. Perry's testimony would have been of minimal value, if not harmful. During her deposition, Ms. Perry admitted she had a prior conviction for a crime involving dishonesty (Doc. 15-2, Ex. 31, transcript p. 4). She testified Mr. Millette was her boyfriend at the time of the

homicide but stated he was seeing another woman at the same time (Id., transcript pp. 5-7). Although she testified Mr. Millette was with her every night after he was evicted from the motel, she could not remember the actual dates, and she admitted both she and Mr. Millette were using drugs at the time (Id., transcript pp. 10-21). She also remembered thinking Mr. Millette would be blamed for the homicide when she watched news coverage of the victim's death (Id., transcript pp. 19-20). During the evidentiary hearing, she testified she could not remember where Mr. Millette was at the time of the homicide but believed he was home with her (Doc. 15-2, Ex. 30, transcript pp. 80-81). She again admitted that on the day of the homicide she and Mr. Millette likely were getting high on drugs (Id., docket pp. 83-84).

With regard to Mr. Rogers, Ms. Perry testified she did not really know him and never saw him with Mr. Millette (Doc. 15-2, Ex. 31, transcript pp. 8, 21-22). However, she admitted while Mr. Millette was living with her, Mr. Rogers would come to her next-door neighbor's home to buy drugs, and they would use the drugs in her yard and bag the drugs inside her home (Id., transcript pp. 24-27). And with regard to the duct tape, Ms. Perry recalled having a roll at her home that was used to fix a cut electrical wire (Id., transcript p. 25). She did not recall if Mr. Millette ever used her roll of duct tape, but she did recall him once using duct tape to affix a temporary license plate to his car (Id., transcript pp. 28-29). At some time, she

noticed the duct tape was missing, but she could not say whether Mr. Rogers took

the tape (Id., transcript p. 27; Ex. 30, transcript p. 83).

Considering Ms. Perry's testimony, she would not have provided a solid alibi

for Mr. Millette. She never clearly indicated he was with her at the time the victim

was killed. Moreover, she admitted that at the time of the crimes, she was Mr.

Millette's girlfriend and high on drugs. Therefore, her credibility and ability to recall

the events would have been subject to impeachment. See Fla. Stat. § 90.608(4) (2000)

("Any party, including the party calling the witness, may attack the credibility of a

witness by: [s]howing a defect of capacity, ability, or opportunity in the witness to

observe, remember, or recount the matters about which the witness testified.");

*Edwards v. State*, 548 So.2d 656, 658 (Fla.1989) (stating that evidence of drug use for

the purpose of impeachment is excluded unless: "(a) it can be shown that the witness

had been using drugs at or about the time of the incident which is the subject of the

witness's testimony; (b) it can be shown that the witness is using drugs at or about

the time of the testimony itself; or (c) it is expressly shown by other relevant evidence

that the prior drug use affects the witness's ability to observe, remember, and

recount").

Ms. Perry's testimony likewise would have provided evidence that Mr.

Millette knew Mr. Rogers better than his statement he knew Mr. Rogers from "the

streets" implied. Her testimony placed Mr. Rogers in her home and on her property

18

on more than one occasion and while Mr. Millette was staying at her home. And her testimony with regard to the duct tape was not very helpful because she did not know if Mr. Millette ever touched her duct tape or if Mr. Rogers took her duct tape.

Rather than call Ms. Perry to testify, trial counsel attempted to distance Mr. Millette from Mr. Rogers by emphasizing that Mr. Millette told the officers he knew Mr. Rogers only "from the streets." (Doc. 6-5, Ex. 1, docket pp. 9, 242-43). And he challenged the reliability of Ms. Lehman's testimony that Mr. Millette's DNA was on the duct tape by emphasizing her lack of experience, highlighting the extreme nature of the numbers generated from her statistical analysis, and pointing out that the victim's mother's DNA was not found on the tape although it was used to bind her and contacted her skin (Id., docket pp. 245-47).

Under the circumstances, trial counsel's decision to not call Ms. Perry to testify was not one that no reasonable attorney would make. Mr. Millette therefore has failed to show that the state courts' denial of this claim was an unreasonable application of *Strickland* or based on an unreasonable application of the facts. *See Ojeda v. Sec'y for Dep't of Corr.*, 279 F. App'x 953, 955 (11th Cir. 2008) (concluding petitioner failed to demonstrate the state habeas court unreasonably applied federal law in denying his claim of ineffective assistance of counsel where counsel's decision to not call alibi witnesses was a reasonable strategic decision). Accordingly, Ground One warrants no relief.

**Ground Two: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING    TO
OBJECT TO THE TESTIMONY OF THE STATE'S DNA EXPERT, KRISTIN
LEHMAN, BASED ON THE LACK OF FOUNDATION FOR HER
STATISTICAL TESTIMONY. THIS VIOLATED THE PETITIONER'S
SIXTH AND FOURTEENTH AMENDMENT RIGHTS GUARANTEED
BY THE UNITED STATES CONSTITUTION. (PRECEDENT *STRICKLAND
v. WASHINGTON*, 466 U.S. 668 (1984); *FRYE v. US.*, 293 F. 1013 (D.C. Cir.
1923)) (Doc. 1, pp. 11-12)**

Mr. Millette contends trial counsel was ineffective in failing to object to the

State's expert's, Ms. Lehman, testimony on the DNA evidence that "lacked the

required foundation for admittance of statistical testimony." He alleges:

> The state failed to lay the proper predicate, under *Frye*, to support the
> admission of Ms. Lehman's testimony. She did not (1) testify that the
> methodology was generally accepted in the scientific community; (2)
> her testimony about the database did not demonstrate sufficient
> knowledge; (3) Ms. Lehman did not testify that her education or
> training included a study of the database; and (4) she did not testify as
> to the makeup of the database. This testimony was not sufficient to
> show that she was a qualified expert.

And he argues "[w]ithout [Ms. Lehman's] testimony, the State would not have been

able to link the Petitioner to the scene of the crime and the jury would have came

[sic] back with a verdict of not guilty."

This claim was raised in Ground Three of Mr. Millette's second amended

Rule 3.850 motion (Doc. 6-6, Ex. 14, docket pp. 168-72). In denying the claim after

the evidentiary hearing, the state post-conviction court stated:

> In Ground 3, Defendant claims that that [sic] his attorney was
> ineffective for failing to object to the testimony of the State's DNA
> expert, Kristin Lehman, based on a lack of foundation for her

statistical testimony. Defendant argues that Lehman's testimony omitted any information regarding the method that she employed to do her statistical analysis, whether that methodology was generally accepted in the relevant scientific community, and whether she received education and/or training regarding the database she used to generate statistical probabilities. Because DNA evidence was the crucial link between Defendant and the robbery, Defendant believes that there is a reasonable probability that, but for counsel's omissions, the DNA evidence would not have been admitted and, as a result, he would have been acquitted at trial.

A court serves a "gatekeeping" function when a party offers expert opinion testimony regarding a scientific or other technical area of study. *Casias v. State*, 94 So. 3d 611,613 (Fla. 2d DCA 2011). To be admissible, the court must find that (1) the expert testimony will assist the jury in understanding the evidence or in deciding a fact in issue; (2) the expert's testimony is based on a scientific principle or methodology that is generally accepted within the scientific community; [FN 1] and (3) the expert witness is sufficiently qualified to render an opinion on the subject. *Id*. When the expert is proffered for the purpose of explaining DNA evidence, consideration of the second prong involves a two-step process: (a) an evaluation of the principles of molecular biology and chemistry used to determine that two DNA samples look alike; and (b) an evaluation of the statistical method used to estimate the frequency of the genetic profile in the population. *Butler v. State*, 842 So. 2d 817, 827-28 (Fla. 2003). The court must find that the expert used or applied principles or methodologies generally accepted within the scientific community as to each step. *Id*.; *accord Murray v. State*, 692 So. 2d 157, 162 (Fla. 1997). The DNA expert must also demonstrate that he or she has the knowledge and experience to testify as to whichever step in the DNA process the expert is offering testimony. *See Id*. at 163-64. In order to provide a statistical analysis of a DNA sample's genetic population frequency, the expert need not be a qualified statistician or mathematician, so long as the witness evidences sufficient knowledge of the statistical methodology employed, and experience and skill in applying it. *See Darling v. State*, 808 So. 2d 145, 158 (Fla. 2002); *Perdomo v. State*, 829 So. 2d 280, 283 (Fla. 3d DCA 2002) (citing to *Fay v. Mincey*, 454 So. 2d 587, 595 (Fla. 2d DCA 1984)). The expert also need not have been involved in the creation of the DNA database, so long as the witness demonstrates sufficient knowledge of

the authoritative sources pertinent to the database. *Branch v. State*, 952
So. 2d 470, 483 (Fla. 2006); *Darling*, 808 So. 2d at 158-59.

Applying these legal principles, the Court found in its July 20,
2016, order that there was insufficient evidence from the existing record
to show that Ms. Lehman had adequate knowledge, based upon
authoritative sources, as to how the DNA database she used was
created; or to show that she had sufficient training and experience in
utilizing that database. The Court also found that Lehman had not
definitively stated what methodology she used in performing her
statistical analysis, even though she described the process at some
length for the jury. [FN 2] As counsel did not challenge Lehman's
predicate for her testimony in this area, there was insufficient evidence
from the existing record to explain counsel's strategy, if any, in this
matter.

A. Evidentiary Hearing Testimony

**(1) Testimony of Kristin Lehman**

Kristin Lehman testified that, at the time of Defendant's trial, she
worked for the Florida Department of Law Enforcement as a DNA
analyst. As part of her of her [sic] job, she studied statistical DNA
analysis, which included training, attendance at lectures, and by-hand
computations. She used an FBI database to analyze how frequently a
genetic profile appeared in general populations, and her knowledge of
the database came from lectures and reading the publications of the
database. To perform her calculations, she used the "product rule,"
which entailed multiplying the frequency that one allele appeared at a
particular location (locus) on a gene with the frequency that another
allele appeared at another locus, and calculating an overall probable
frequency that the alleles appearing at 13 separate loci would appear at
the same loci in a general population.

The FBI database consists of three subsections: the African
American database, the Caucasian database, and the Southeastern
Hispanic database. The African American and Caucasian databases
were published in Volume 44 of the Journal of Forensic Sciences in
1999, and consists of between 195 to 210 individuals. The database for
the Southeastern Hispanics was published in Volume 46 of the Journal
of Forensic Sciences in 2001, and it consists of between 191 to 240

individuals. The African American and Caucasion databases are comprised of voluntary DNA samples collected by Dr. Art E. Eisenburg and analyzed by the FBI using ABI amplification kits. The Southeastern Hispanic database is comprised of blood samples collected from two Florida laboratories, one in Miami Metro Dade using ABI amplification kits, and one in Palm Beach County using Promega kits. Bruce Budowle, a forensic scientist in the field of population genetics, assessed the overall accuracy and viability of the database for forensic calculations in a peer-reviewed article published in the Journal of Forensic Sciences, a publication generally accepted within the scientific community.

### (2) Testimony of Trial Counsel

Trial counsel for Defendant, Frederick Mercurio, testified that he did not object to the inadequacy of the predicate for the State's DNA expert because he believed that doing so would ultimately allow the State to enter more evidence to support her knowledge in this area, making her appear even more credible to the jury. His strategy was to challenge the expert's lack of experience and to highlight the extreme nature of the numbers generated from the expert's statistical analysis, which had proven a successful technique in the past.

B. Finding

The Court finds that Lehman was qualified to testify as a DNA expert regarding the statistical method she used to generate population frequencies for the DNA evidence in this case. Had counsel challenged the predicate for Lehman's testimony in this area, the State could have further questioned Lehman; thereby demonstrating her knowledge of how the database was compiled, her training and experience in using the database, and her methodology for conducting her statistical analysis. Consequently, the fact that counsel did not raise an ultimately meritless objection did not prejudice Defendant's case. *See Simmons v. State*, 105 So. 3d 475, 495 (Fla. 2012). [FN 3]

For this reason, Ground Three shall be denied.

[FN 1] This is the standard applicable at the time of Defendant's trial, as set forth in *Frye v. U.S.*, 293 F. 1013 (App. D.C. 1923). *See, generally, R.C. v. State*, 192 So. 3d 606, 609-10 (Fla. 2d DCA 2016).

23

[FN 2] Lehman's qualifications as to the first step in the process were not challenged, and the Court found that the record established Lehman's qualifications to testify as to step one-the testing methodology for determining that two DNA samples look alike. *See* Order filed March 29, 2016.

[FN 3] Defense counsel raised an additional argument at the hearing that trial counsel was ineffective for failing to call a DNA witness to challenge the State's expert. This claim was not presented in Defendant's postconviction motion and was beyond the scope of the hearing.

(Doc. 6-6, Ex. 25, docket pp. 264-68).

The state post-conviction court's conclusion, that defense counsel's failure to object to the testimony of the State's DNA expert based on a lack of foundation for her statistical testimony did not prejudice Mr. Millette as required to establish ineffective assistance of counsel, was not objectively unreasonable. After hearing the testimony from the State's expert during the post-conviction evidentiary hearing, the court found she was qualified to testify as a DNA expert regarding the statistical method she used. The court further found had defense counsel objected at trial to the inadequacy of the predicate for the expert, the State would have been allowed to further question the expert and establish her knowledge of how the database was compiled, her training and experience in using the database, and her methodology for conducting her statistical analysis. Accordingly, Mr. Millette cannot demonstrate

resulting prejudice because had counsel objected, the DNA evidence still would have been admitted after the proper foundation had been laid.[4]

The state courts' rejection of this ground of ineffective assistance of counsel was neither an unreasonable application of *Strickland* nor based on an unreasonable determination of the facts in light of the evidence presented in state court. Accordingly, Ground Two warrants no relief.

**Ground Three: THE STATE COURT ERRED IN DENYING THE PETITIONER'S CLAIM THAT THE PROSECUTOR COMMITTED MISCONDUCT ON A FUNDAMENTAL LEVEL BY IMPERMISSIBLY AND EXPLICITLY COMMENTING ON THE DEFENDANT'S RIGHT TO REMAIN SILENT AND HIS PRESUMPTION OF INNOCENCE. THIS WAS DONE IN VIOLATION OF THE PETITIONER'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS GUARANTEED HIM BY THE UNITED STATES CONSTITUTION (Doc. 1, pp. 13-15)**

Mr. Millette contends his rights under the Fifth and Fourteenth Amendments were violated when the prosecutor committed misconduct during voir dire. Specifically, he alleges the prosecutor's following comments while questioning prospective jurors violated his presumption of innocence and right to remain silent:

MS. BUFF (prosecutor): Mr. Giovenco, I'm going to come back to you for a minute. Do you watch TV?

PROSPECTIVE JUROR GIOVENCO: Yes.

---

4 Trial counsel's decision to not object to the inadequacy of the predicate for Ms. Lehman because it would allow the State to ask her questions that would bolster her credibility and instead challenge her lack of experience and the extreme nature of the numbers was reasonable trial strategy (See Docket 6-5, Ex. 1, docket pp. 189-99). Because counsel's decision was based in reasonable trial strategy, Mr. Millette has not demonstrated deficient performance as required by *Strickland*. 466 U.S. at 686–87.

25

MS. BUFF: A fair bit? Do you ever watch TV and see somebody like, it could be anyone on TV, they're, you know, on the news or whatever, they're accused of doing something, they're like, I did not do that, I did not do that, I'm absolutely innocent of that. Do you necessarily believe them just because they say that. . . . You would want to know more about it right?

\*\*\*

MS. BUFF: Would you necessarily take his word that he didn't?

PROSPECTIVE JUROR GIOVENCO: That he didn't do it? No.

MS. BUFF: Yeah. Because, you know, can you think of some instances where people said they didn't do something and then it became pretty clear that they did.

\*\*\*

MS. BUFF: Okay. I mean, you have somebody like, not in a political context, but Bill Clinton, I did not have sexual relations with that woman, Monica Lewinsky. I mean, people say that they didn't do things all the time; right?

PROSPECTIVE JUROR DELAPHENA: Right.

MS. BUFF: I didn't bet on baseball. Pete Rose.

(Doc. 6-4, Ex. 1, docket pp. 120-23).

Mr. Millette argues the questions and analogies: 1) suggested he was not to be presumed innocent; 2) inferred he needed to assert a defense and testify to prove he was not guilty; 3) created an expectation in the minds of the jurors that they would hear a denial of guilt from him; and 4) implied his "proclamation of innocence" was not true.

A similar claim was raised in state court in Argument I of Mr. Millette's Initial Brief on direct appeal (Doc. 6-6, Ex. 4, docket pp. 23-29). There, Mr. Millette argued the prosecutor improperly commented on his right to remain silent and credibility if

he chose to testify (Id.). He never argued the comments infringed on his presumption of innocence (Id.). Although the state appellate court affirmed the convictions on direct appeal without discussion (Doc. 6-6, Ex. 6), the court's decision warrants deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254-55 (11th Cir. 2002). *See also Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

The prosecutor's comments did not infringe on Mr. Millette's right to remain silent or his presumption of innocence. They did not involve whether Mr. Millette would testify in the case or whether either side could call him as a witness. Nor did they imply he had a burden to present evidence and prove his innocence. And it was appropriate for the prosecutor to ask the prospective jurors if they would believe someone merely because he denied committing a crime, or if they would base their decision on all the evidence, because there was evidence Mr. Millette denied using the duct tape (Detective Robinson testified that Mr. Millette stated "he had never used, seen, or had the opportunity or necessity to use duct tape at the Siesta Inn." (Doc. 15-2, Ex. 29, transcript p. 297)), on which his DNA was discovered. *See, e.g., Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991) ("Voir dire examination serves the dual

purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges."); *Darbin v. Nourse*, 664 F.2d 1109, 1113 (9th Cir. 1981) ("The principal purpose of voir dire is to probe each prospective juror's state of mind to enable the trial judge to determine actual bias and to allow counsel to assess suspected bias or prejudice. Thus, a voir dire examination must be conducted in a manner that allows the parties to effectively and intelligently exercise their right to peremptory challenges and challenges for cause."); *United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002) ("Counsel have an additional purpose in voir dire moreover and that involves exposing jurors to various arguments they intend to make at trial."). Moreover, it was appropriate for the prosecutor to clarify her inquiry by referring to well publicized occasions where a person's claim of innocence was refuted by other evidence. *See Walker v. State*, 724 So. 2d 1232, 1233 (Fla. 4th DCA 1999) ("[W]here a juror's attitude about a particular legal doctrine. . .is essential to a determination of whether challenges for cause or peremptory challenges are to be made, it is well settled that the scope of the voir dire properly includes questions about and references to that legal doctrine even if stated in the form of hypothetical questions.").

Even if the prosecutor's comments were improper, Mr. Millette cannot show prejudice. The comments were brief and not repeated after voir dire. And the jury was repeatedly advised that the burden of proof rested solely on the State, Mr.

Millette was innocent until proven guilty, he had the absolute right to remain silent, and the jury was prohibited from holding Mr. Millette's silence and decision not to testify against him (Doc. 6-3, Ex. 1, docket pp. 22-24, 27; Doc. 6-4, Ex. 1, docket pp. 147-48, 155, 213-14; Doc. 6-5, Ex. 1, docket p. 215, 243, 248, 278-79). Moreover, the State presented ample evidence of Mr. Millette's guilt, including that he had a verbal altercation with the victim just four days before the murder, his DNA was found on the duct tape used to bind the victim's mother at the time of the robbery and homicide, and he knew the co-defendant whose DNA was discovered under the victim's fingernails. *See, e.g.*, *Bennett v. Angelone*, 92 F.3d 1336, 1345–46 (4th Cir. 1996) (in determining prejudice, the habeas court must look at "the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated.").

Mr. Millette has not shown a reasonable probability that the outcome of trial would have been different but for the prosecutor's remarks. Accordingly, he fails to show that the comments prejudicially affected his substantial rights. *See United States v. Hall*, 47 F.3d 1091, 1098 (11th Cir. 1995). As Mr. Millette has not established that the state appellate court's denial of his claim was contrary to or involved an unreasonable application of clearly established federal law, he is not entitled to relief on Ground Three.

**Ground Four: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE STATE'S IMPROPER LINE OF QUESTIONING DURING VOIR DIRE AND FAILING TO MOVE TO STRIKE THE JURY VENIRE BASED ON THE STATE'S IMPROPER COMMENTS. THIS VIOLATED THE PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS GUARANTEED BY THE UNITED STATES CONSTITUTION. (PRECEDENT *STRICKLAND v. WASHINGTON*, 466 U.S. 668 (1984)) (Doc. 1, pp. 16-18)**

**Ground Six: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO EXERCISE A CHALLENGE FOR CAUSE OF A JUROR. THIS WAS IN VIOLATION OF THE PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS GUARANTEED BY THE UNITED STATES CONSTITUTION. (PRECEDENT *STRICKLAND v. WASHINGTON*, 466 U.S. 668 (1984)) (Doc. 1, pp. 22-24)**

In Ground Four, Mr. Millette contends defense counsel was ineffective during voir dire in failing to: 1) object to the prosecutor's comments set forth above in Ground Three, and 2) move to strike the entire jury panel after they heard the comments. He argues an objection and motion to strike the panel would have been granted because the comments tainted the entire jury panel.

In Ground Six, Mr. Millette contends defense counsel was ineffective in failing to strike Juror Delaphena for cause. He alleges Delaphena made comments showing he was biased and could not afford Mr. Millette the presumption of innocence.

These claims were raised, respectively, in state court in Grounds One and Two of Mr. Millette's second amended Rule 3.850 motion (Doc. 6-6, Ex. 14, docket pp. 160-64). In denying these claims, the state post-conviction court stated:

Defendant claims that the State asked questions during voir dire that constituted improper commentary on his right to remain silent, to retain the presumption of innocence, and to hold the State to its burden of proof. Because counsel failed to move to strike the panel on the basis of these comments, or to challenge one of the prospective jurors (Juror D) in light of his answers, Defendant argues that he was tried by a jury biased against him for his decision to remain silent and to present no defense theory.

The portion of the prosecutor's voir dire challenged by Defendant reads, in relevant part, as follows:

STATE: A fair bit? Do you ever watch TV and see somebody like, it could be anyone on TV, they're, you know, on the news or whatever, they're accused of doing something, they're like, I did not do that, I did not do that, I'm absolutely innocent to that. Do you necessarily believe them just because they say that[?]

PROSPECTIVE JUROR G: Well, no and yes. You know, it's an old saying you can never condemn anyone unless you walk a mile in their shoes or know all the evidence at hand. So, no, not all the time.

STATE: You would want to know more about it; right?

PROSPECTIVE JUROR G: If I was watching television and somebody was blowing somebody away, boom, boom, boom, and it was the news, and then all of a sudden he walked out with a gun and the police blew him away, then of course he did it. But if he was not there to see it, no, I wouldn't take someone else's word that he did it.

STATE: Would you necessarily take his word that he didn't?

PROSPECTIVE JUROR G: That he didn't do it? No.

STATE: Yeah. Because, you know, can you think of some instances where people said they didn't do something and then it became pretty clear that they did.

31

PROSPECTIVE JUROR G: Yes. But, you know, that's what we have a court system for.

STATE: Right.

PROSPECTIVE JUROR G: Find out who's right or wrong. I mean, who am I to judge unless I'm on the jury.

* * *

STATE: Okay. Let me come over here. Mr. D[]. What? He's like, why are you asking me?

PROSPECTIVE JUROR D: I wouldn't necessarily believe a statement like that.

STATE: Okay. I mean, you have somebody like, not in a political context, but Bill Clinton, I did not have sexual relations with that woman, Monica Lewinsky. I mean, people say that they didn't do things all the time; right?

PROSPECTIVE JUROR D: Right.

STATE: I didn't bet on baseball. Pete Rose.

PROSPECTIVE JUROR D: Pete Rose, yeah.

All of the petit jurors selected for Defendant's jury were drawn from a single panel of 50 people, so that each of the deliberating jurors heard this exchange. An entire panel may be tainted if subjected to improper comments that are not followed by a curative instruction. *See generally Pait v. State*, 112 So. 2d 380, 385 (Fla. 1959) (improper prosecutorial statements to jury require reversal in absence of objection from counsel where error is fundamental, even when trial judge issues curative rebuke). The Court concludes, however, that the statements at issue were not improper.

Voir dire serves the function of allowing the court to remove prospective jurors who will not be able to impartially follow the court's instructions and evaluate the evidence. *Ramirez v. State*, 901 So. 2d 332,

334 (Fla. 3d DCA 2005). Counsel for both the State and the defendant have the right to examine jurors orally, Fla. R. Crim. P. 3.300(b), and the court "must allow counsel the opportunity to ascertain latent or concealed prejudgments by prospective jurors." *Miller v. State*, 683 So. 2d 600,602 (Fla. 2d DCA 1996); *accord Harrison v. State*, 172 So. 3d 1018, 1020 (Fla. !51 DCA 2015); *Hillsman v. State*, 159 So. 3d 415, 419 (Fla. 4th DCA 2015). A trial court, consequently, should allow questions on jurors' attitudes regarding certain issues, where those attitudes are "essential to a determination of whether challenges for cause or peremptory challenges are to be made." *Harrison*, 172 So. 3d at 1020 (internal citations omitted).

Voir dire is not unfettered, however, and when a statement is "fairly susceptible" to being interpreted by the jury as a comment on a defendant's right to remain silent, this can constitute reversible error. *State v. Kinchen*, 490 So. 2d 21, 22 (Fla. 1985). Comments that erroneously shift the burden of proof, or mischaracterize the intractable nature of the presumption of innocence, are also improper. *See Warmington v. State*, 149 So. 3d 648, 652 (Fla. 2014) (comments shifting burden of proof improper); *Nurse v. State*, 932 So. 2d 290 (Fla. 2d DCA 2005) (comments denigrating presumption of innocence improper).

In this context, courts must protect against prosecutorial comments that devalue the defendant's constitutional rights directly or by "innuendo or faint praise." *Marston v. State*, 136 So. 3d 563,570 (Fla. 2014) (quoting *Varona v. State*, 674 So. 2d 823 (Fla. 4th DCA 1996)). For example, in *Marston*, the Florida Supreme Court found that the prosecutor improperly commented on the defendant's right to remain silent by repeatedly saying to prospective jurors that the State could not "put [the defendant] on the stand," and that the defendant had the "absolute right" "to remain silent" and "keep his mouth shut this entire time," and that he could "sit there and play dominoes the whole time," "sit there and not say a word," "read magazines," and "play on Facebook." 136 So. 3d 563, 570-71 (Fla. 2014); *see also Varona*, 674 So. 2d at 823-26 (error to say defendant had a "right to remain silent," [did not] have to do anything," "[didn't] have to say one word" and "could sit there and play crossword puzzles"); *Harrell v. State*, 647 So. 2d 1016, 1018 (Fla. 4th DCA 1994) (error to say, "[d]efendant has a constitutional protection ... not to testify if he does not want to or his attorney chooses for him not to"); *Jackson v. State*, 453 So. 2d 456, 458 (Fla. 4th DCA 1984) (error to say, "You understand that in Perry

Mason somebody is going to standup at some time and say that they did it. ... Just because that doesn't happen here doesn't mean that that man's not guilty, does it?"). District Courts identified similar errors when one prosecutor improperly told the jury that the defendant "no longer ha[d] that presumption [of innocence]," *Easterly, v. State*, 22 So. 3d 807, 816 (Fla. 1st DCA 2009), and another suggested that the defendant had the burden of proof by questioning why the defendant never presented the essential alibi witness, *Gutierrez v. State*, 798 So. 2d 893, 894-95 (Fla. 4th DCA 2001) ("[W]here's Roman? Roman's his friend.").

     Defense counsel's performance may fall below professional standards where counsel fails to object to such improper commentary during voir dire and "there was no tactical reason for failing to object." *McCoy v. State*, 113 So. 3d 701, 713 (Fla. 2013) (quoting *Stephens v. State*, 975 So. 2d 405, 420 (Fla. 2007)). However, the questions and comments made by the prosecutor in this case do not resemble the types of commentary that our courts have disapproved. The questions appear to have been directed at discovering whether any juror was unable to remain open minded about evidence of guilt if an accused denied wrongdoing and all of the evidence was circumstantial. Just prior to the passage in question, the prosecutor offered hypotheticals involving circumstantial evidence of a person's guilt, and asked if any prospective juror would be unable to consider guilt once the accused denied wrongdoing. One such portion reads:

     STATE: ... Have you ever had a roommate?

     PROSECTIVE JUROR 0: Uh-huh.

     STATE: Ever bring home leftovers and magically they disappear from the fridge?

     PROSPECTIVE JUROR 0: Sure.

     STATE: And then what do you think when they disappeared? Do you think that the fridge fairy came in and took them?

     PROSPECTIVE JUROR 0: They ate them.

STATE: They ate it even though you didn't see them eat?

PROSPECTIVE JUROR 0: Pretty safe.

STATE: Pretty safe bet?

PROSPECTIVE JUROR 0: They'll deny it.

STATE: Even if he denies it, you still know what happened; right?

That the prosecutor used hypotheticals and analogies to Bill Clinton and Pete Rose to illustrate her point was not improper, as the use of hypotheticals are permissible where they do not include the facts of the case. *Blevins v. State*, 766 So. 2d 401 (Fla. 2d DCA 2000). Neither the legal troubles of Bill Clinton, nor those of Pete Rose, involved criminal allegations similar to those filed against Defendant. *Compare with Bledsoe v. State*, 150 P. 3d 868 (Kan. 2007) (finding defense counsel's analogy to highly publicized case of Susan Smith constituted deficient performance, where both Smith and defendant were charged with murder and each had gone on television to plead for safe return of victims, who were already dead).

The three cases cited by Defendant in support of his argument are distinguishable. In *Lawrence v. State*, 829 So. 2d 955 (Fla. 3d DCA 2002), the prosecutor repeatedly made direct references to the defendant's right to remain silent and to not present a defense ("[D]efendant and the defense attorneys have an absolute right not to do anything"), and suggested that the defendant's testimony would be the most pertinent and interesting part of the case ("[O]ften times the most important moment in a trial is if the defendant testifies, .. there is just a heightened sense of expectation .... You can expect whatever you want to expect."). In *Gore v. State*, 719 So. 2d 1197 (Fla. 1998), the prosecutor directly misstated the burden of proof by arguing to jurors in closing, "If you believe [the defendant] did not tell you the truth, that he made up a story, that's it, he's guilty of First Degree Murder." And the error in *Rodas v. State*, 821 So. 2d 1150 (Fla. 4th DCA 2002), did not involve any allegedly improper questioning by the State; rather, it focused only on statements volunteered by prospective jurors. The prosecutor's questions in Defendant's case more closely resemble questions that seek to

identify jurors who cannot find a defendant guilty unless there is an eyewitness. Such inquiries have been found to not be impermissible comment on a defendant's right to remain silent. *Bell v. State*, 108 So. 3d 639,651 (Fla. 2013).

Ultimately, the trial court instructed the entire panel prior to voir dire regarding the State's burden of proof and Defendant's right to remain silent, and cautioned that the jury should draw no inferences from the fact that Defendant might not testify. The trial court gave the empaneled petit jurors similar instructions just prior to opening statements. *See Andrews v. State*, 443 So. 2d 78, 84 (Fla. 1983) (approving standard jury instruction, which not only informs jury of defendant's presumption of innocence and right to remain silent, but admonishes jury to draw no adverse inference from defendant's exercise of right). Because the trial court properly instructed the jury on this matter, the Court concludes that there is no reasonable probability that, had counsel moved to strike the jury panel on the basis alleged in Ground One, the outcome would have been different.

Counsel's alleged failure to strike Juror D is also not evidence of deficient performance. A juror must be excused for cause "if any reasonable doubt exists as to whether the juror possesses an impartial state of mind." *Overton v. State*, 801 So. 2d 877, 890 (Fla. 2001) (quoting *Kearse v. State*, 770 So. 2d 1119, 1128 (Fla. 2000)). This is because the presumption of innocence is defeated if "a juror is taken upon a trial whose mind is in such condition that the accused must produce evidence of his innocence to avoid a conviction." *Overton*, 801 So. 2d at 891 (quoting *Singer v. State*, 109 So. 2d 7, 24 (Fla. 1959)); *Caldwell v. State*, 50 So. 3d 1234, 1237 (Fla. 2d DCA 2011).

The answer given by Juror D, that "[he] wouldn't necessarily believe a statement like that," did not indicate that he was partial, but rather that he would be willing to consider evidence of guilt despite the fact that an accused denied wrongdoing. This is distinguishable from the answers given by prospective jurors in *Rodas*, who said that they would have difficulty setting aside their feeling that the defendant was guilty. *Compare also with Caldwell, supra* (finding error for failure to strike prospective juror who said that she did not understand why somebody would not want the opportunity to speak the truth "[u]nless they [we]re guilty."); *Mitchell v. State*, 862 So. 2d 908 (Fla. 4th DCA 2003) (holding it was error to not excuse jurors who said they would question why a

defendant who was not guilty would not want to "tell their story"); *Darr v. State*, 817 So. 2d 1093, 1093-94 (Fla. 2d DCA 2002) (finding error for failure to strike prospective juror who said that the defendant's decision not to testify "would affect [him]" and that if the State presented evidence to prove that the defendant was guilty, the defense would "have to give a rebuttal of some sort"). With respect to Ground Two, the Court concludes that Defendant has failed to demonstrate ineffective assistance for counsel's alleged failure to challenge Juror D for cause.

For these reasons, Grounds One and Two shall be denied.

(Doc. 6-6, Ex. 28, docket pp. 285-92) (footnotes omitted).

### a. Ground Four

As the state post-conviction court found, and as discussed above in Ground Three, the prosecutor's comments were not improper. The state post-conviction court therefore determined had defense counsel moved to strike the jury panel, the motion would have been denied. Consequently, Mr. Millette shows neither deficient performance by counsel nor prejudice. *See Khianthalat v. Sec'y, Dep't of Corr.*, 2017 WL 9285601, at *7 (11th Cir. Dec. 20, 2017) ("Counsel. . .cannot be ineffective for failing to file a meritless motion. . . .").

Mr. Millette has failed to demonstrate the state courts' rejection of this ground of ineffective assistance of counsel was either an unreasonable application of *Strickland* or based on an unreasonable determination of the facts in light of the evidence presented in state court. Accordingly, Ground Four warrants no relief.

### b. Ground Six

37

Mr. Millette contends counsel was ineffective in failing to move to strike Juror Delaphena for cause. He alleges Delaphena "was biased and could not operate under a presumption of innocence towards" him (Doc. 1, p. 23).

During voir dire, the prosecutor asked:

Do you ever watch TV and see somebody like, it could be anyone on TV, they're, you know, on the news or whatever, they're accused of doing something, they're like, I did not do that, I did not do that, I'm absolutely innocent of that. Do you necessarily believe them just because they say that. [sic]

After other prospective jurors responded, Delaphena said, "I wouldn't necessarily believe a statement like that." The prosecutor and Delaphena then had the following brief exchange:

MS. BUFF: Okay. I mean, you have somebody like, not in a political context, but Bill Clinton, I did not have sexual relations with that woman, Monica Lewinsky. I mean, people say that they didn't do things all the time; right?

DELAPHENA: Right.

MS. BUFF: I didn't bet on baseball. Pete Rose.

DELAPHENA: Pete Rose, yeah.

(Doc. 6-4, Ex. 1, docket pp. 120-24).

"The constitutional standard of fairness requires that the criminally accused have a panel of impartial, indifferent jurors." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). "The purpose of a voir dire is to ascertain whether a potential juror can render a verdict solely on the basis of the evidence presented and the charge of the

38

trial court." *Wilcox v. Ford*, 813 F.2d 1140, 1150 (11th Cir. 1987). In Florida, "[t]he test for determining juror competency is whether the juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court." *Smith v. Florida*, 28 So.3d 838, 859 (Fla.2009) (citing *Lusk v. Florida*, 446 So.2d 1038, 1041 (Fla.1984)). And to establish that he was prejudiced by Delaphena's presence on the jury, Mr. Millette must demonstrate that Delaphena was actually biased against him. *See Smith v. Phillips*, 455 U.S. 209, 215 (1981).

When it ruled on Mr. Millette's claim, the state post-conviction court reviewed Delaphena's voir dire testimony and denied the claim after finding he exhibited no actual bias. This is a finding of fact that this Court must accord deference. See 28 U.S.C. § 2254(e)(1). Mr. Millette has not presented any evidence to rebut the state post-conviction court's finding, and therefore this presumption remains undisturbed.

Further, having reviewed the voir dire transcript, the Court concludes the state post-conviction court's determination is well-supported. Delaphena's comment that he "wouldn't necessarily believe" a person's claim of innocence was not only equivocal but fair and rational as well. The statement in no way implies Delaphena was biased against Mr. Millette or against any defendant merely because he is accused of a crime. Rather, as the state post-conviction court found, the statement implies Delaphena "would be willing to consider evidence of guilt despite the fact

39

that an accused denied wrongdoing." Delaphena expressed nothing remotely

indicative of bias.

Counsel cannot be deemed deficient in failing to move to strike a competent

juror, and Mr. Millette fails to establish he was actually prejudiced by counsel's

actions. Accordingly, Ground Six warrants no relief.

**Ground Five: TRIAL COURT ERRED IN DENYING PETITIONER'S
MOTION FOR MISTRIAL BASED ON THE PROSECUTOR'S
COMMENTS IN CLOSING ARGUMENTS THAT SHIFTED THE BURDEN
OF PROOF. THIS WAS DONE IN VIOLATION OF THE PETITIONER'S
FIFTH AND FOURTEENTH AMENDMENT RIGHTS GUARANTEED HIM
BY THE UNITED STATES CONSTITUTION (Doc. 1, pp. 20-21)**

Mr. Millette contends the state trial court violated his rights under the Fifth

and Fourteenth Amendments when it denied his motion for mistrial after the

prosecutor made comments during closing argument that shifted the burden of proof

from the State to him because they suggested he had a duty to refute the State's DNA

evidence. The comments with which he takes issue are as follows:

> The Defense suggests to you that you can't rely on the DNA analyst.
> Well, gosh, she is not that good but she swabbed- she used one swab for
> all four areas. The only person you're hearing that from is the Defense.
> Have you heard from anyone who knows – you know, there is nothing
> that we've heard today from somebody who knows something about –
>
> ***
>
> What is there to make you think that what she did was improper? Do
> any of you know? She's a DNA analyst. She's been doing this for quite
> some time. And what has suggested to you that she's done anything
> wrong or that she did not follow protocol? Because the Defense
> attorney says so? She's experienced and she followed protocol and she
> told you why it is that she did the things that she did, why she only did

40

the ends to avoid the DNA of -- the potential DNA of the victim, Anna Jarosz, and why it was that she used one, because she is trying to get enough DNA on that swab to be able to test. Who would know that better than she? There is absolutely no evidence that she did anything improper; that she did anything wrong.

***

There is nothing that you have heard today that suggests that her statistics are skewed and that the statistics that are used by her and by the FBI database are skewed.

(Doc. 6-5, Ex. 1, docket pp. 259-61).

The State argues this claim is unexhausted and procedurally defaulted because it was not raised in state court (Doc. 6, pp. 23-25). The Court agrees.

Before seeking habeas relief for a violation of federal law under 28 U.S.C. § 2254, a petitioner "must exhaust all state court remedies available for challenging his conviction." *Lucas v. Sec'y, Fla. Dep't of Corr.*, 682 F.3d 1342, 1351 (11th Cir. 2012) (citing § 2254(b), (c)). To properly exhaust a claim, a state prisoner must fairly present his claim in each appropriate state court in such a manner as to alert that court to the claim's *federal nature*. *See Baldwin*, 541 U.S. at 29.

Mr. Millette did not present his federal constitutional claim to the state courts. In his Initial Brief on direct appeal, he challenged the denial of his motion for mistrial only on state law grounds and cited only state law cases (Doc. 6-6, Ex. 4, docket pp. 34-37). He did not mention the federal constitution, did not assert a violation of any federal constitutional right, and did not cite any federal cases (Id.). He argued his claim only as an issue of state law. No federal right or federal claim

was ever asserted (Id.). He therefore failed to fairly present his Fifth and Fourteenth Amendment violation claim to the state courts.

A petitioner who fails to properly exhaust a claim is procedurally barred from pursuing that claim on habeas review in federal court unless the petitioner shows either cause for and actual prejudice from the default or establishes a fundamental miscarriage of justice occasioned by a constitutional violation that resulted in the conviction of a defendant who was "actually innocent." *See Marek v. Singletary*, 62 F.3d 1295, 1301–02 (11th Cir. 1995); *Lucas*, 682 F.3d at 1353. Mr. Millette shows no cause or prejudice. Nor does he allege grounds for an actual innocence claim. Thus, his claim is procedurally barred from federal review. Accordingly, Ground Five warrants no relief.

**Ground Seven:   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO MOVE TO SUPPRESS DEFENDANT'S STATEMENTS MADE DURING CUSTODIAL INTERROGATION. THIS VIOLATED THE PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS GUARANTEED BY THE UNITED STATES CONSTITUTION. (PRECEDENT *STRICKLAND v. WASHINGTON*, 466 U.S. 668 (1984); *MIRANDA v. ARIZONA*, 384 U.S. 436 (1966)). (Doc. 1, pp. 25-26)**

Mr. Millette contends trial counsel was ineffective in failing to move to suppress his statement to police that he knew Mr. Rogers "from the streets." He argues the statement should have been suppressed because although his *Miranda* rights were read to him and he understood those rights, he never voluntarily waived them. He alleges after he was read his *Miranda* rights, Detective Jackson asked him if

42

he wished to answer questions. In response, he said he wanted to know what the nature of the arrest and interrogation were about. Instead of explaining why he was in custody and being interrogated, Detective Jackson told him that before they could explain anything, Mr. Millette needed to waive his *Miranda* rights. He thereafter responded to the detectives' questions "in an attempt to find out what the investigation was about." He argues he therefore did not voluntary waive his *Miranda* rights but rather "acquiesced to the detectives' coercive interrogation techniques." And he argues he was prejudiced by the statement because it was the only evidence that connected him to Mr. Rogers and established that he was a principal to the offenses.

This claim was raised in state court in Ground Four of Mr. Millette's second amended Rule 3.850 motion (Doc. 6-6, Ex. 14, docket pp. 172-75). The state post-conviction court rejected the claim that counsel was ineffective in failing to move to suppress the statement, determining Mr. Millette had failed to establish the statement was involuntary, and there was no reasonable probability that the outcome of his trial would have been different had the statement been suppressed:

> In his fourth claim, Defendant alleges that counsel was ineffective for failing to move to suppress an allegedly involuntary statement he made to Detective Robinson while in custody and after receiving *Miranda* warnings. Had the motion succeeded, Defendant claims that the jury would never have heard Defendant's statement that he knew Benjamin Rogers, the co-perpetrator, "from the streets," thereby eliminating the only link between Defendant and Rogers. But for this error, Defendant asserts there is a reasonable probability that he

43

would have been acquitted at trial. For the following reasons, this claim is denied.

At trial, Pat Robinson, a detective with the Sarasota Police Department, testified on direct examination that he and Detective Jackson interviewed Defendant after arresting him on September 3, 2008. Detective Jackson read Defendant his *Miranda* warnings, and Defendant indicated that he understood those warnings and that he wanted to speak with the Detectives. Defendant admitted that "he did know Benjamin Rogers." On cross examination, defense counsel asked Detective Robinson if he had questioned Defendant as to where he knew Rogers from. Detective Robinson responded affirmatively and said that Defendant replied, "[F]rom the streets." Counsel followed this up with questions designed to show that "from the streets" was a familiar phrase, and that knowing a person "from the streets" did not mean that the person was Defendant's "best friend[]."

Defendant's claim is without merit because there is no evidence that Defendant's conversation with Detective Robinson was involuntary. Counsel may be ineffective for not moving to suppress a statement made by a defendant during police interrogation only if the statement was involuntary, or defendant did not receive adequate *Miranda* warnings. *Mondy v. State*, 6 So. 3d 1251, 1252 (Fla. 2d DCA 2009) (citing to *Rouzard v. State*, 952 So. 2d 1290, 1292 (Fla. 4th DCA 2007)). Where the record conclusively refutes such a claim, an evidentiary hearing is not required. *Stewart v. State*, 629 So. 2d 267, 268 (Fla. 2d DCA 1993).

Detective Robinson testified at trial that he and Detective Jackson questioned Defendant on the date of his arrest. Detective Jackson administered *Miranda* warnings and Defendant said that he understood them and that he wanted to speak with the officers. These facts provide probative evidence that Defendant's statements were voluntary. Defendant now asserts additional facts not in the existing record. He claims that after being read his *Miranda* rights, he asked to know about the nature of the arrest and the interrogation, and that Detective Jackson told Defendant that before they could explain the situation, Defendant had to waive his *Miranda* rights. Defendant claims that he never actually did so; rather, he alleges he merely acknowledged an understanding of his rights and "acquiesced to the detectives' coercive interrogation techniques." Assuming these

44

allegations to be true, Defendant has failed to assert facts warranting the relief requested.

The State bears a heavy burden of showing that a confession was "not compelled, but was voluntarily made," and that a defendant "knowingly and intelligently waived his or her privilege against self-incrimination and the right to counsel." *Ross v. State*, 45 So. 3d 403,418 (Fla. 2010) (quoting *Ramirez v. State*, 739 So. 2d 568,573,575 (Fla. 1999). *Miranda* warnings are designed to address and minimize the coercive effects of interrogation, and the fact that a suspect chooses to speak after being informed of his rights is "highly probative" of voluntariness. *Ross*, 45 So. 3d at 418-19 (quoting *Oregon v. Elstad*, 470 U.S. 298,318 (1985)). A statement made after *Miranda* warnings are administered may still be involuntary where a defendant was deliberately coerced, intimidated, or deceived; so that the totality of the circumstances indicates that the decision to relinquish his or her constitutional rights was not the product of "free and deliberate choice." *Ross*, 45 So. 3d at 418-19 (quoting *Ramirez*, 739 So. 2d at 575).

That Detectives Robinson and Jackson may have told Defendant they could not speak with him regarding the nature of their investigation unless and until he waived his *Miranda* rights does not present an unduly coercive set of facts; rather, it would avoid unlawful circumstances that our appellate courts have disapproved. For example, in *Ramirez, supra*, the Florida Supreme Court found that police engaged in improperly coercive tactics by delaying the administration of *Miranda* warnings to a suspect until after he made incriminating statements, and then attempting to minimize and downplay the significance of the *Miranda* rights by not reading them carefully and thoroughly. Defendant does not allege that the Detectives delayed in reading him his rights, or that they threatened, cajoled, or tricked him into giving a statement. Rather, he claims that the officers plainly stated that they would not talk to him without obtaining a waiver of his rights, and this does not evidence coercion.

Moreover, even if counsel should have filed a suppression motion, Defendant cannot demonstrate that there is a reasonable probability that, but for counsel's omission, he would have been acquitted. *See Strickland*, 466 U.S. at 697 (holding that ineffective assistance of counsel claim properly denied absent evidence of prejudice). While Defendant's statement provided evidence linking

Defendant to Benjamin Rogers, it was not the *sine qua non* link to the crime. Evidence seized from the Siesta Inn led Detective Robinson to arrest Defendant and Benjamin Rogers, and DNA analysis positively linked the two men to the crime scene. Other evidence showed that Defendant had been staying at the Siesta Inn, and that Defendant had engaged in a dispute with the murder victim that involved the police on March 16, 2008, four days prior to the date of the crimes. This was sufficient evidence to support the conviction. A defendant must do more than speculate that an error affected the outcome of the proceeding to obtain relief under *Strickland. Bradley*, 33 So. 3d 664,672 (Fla. 2010).

　　　　For these reasons, Ground Four shall be denied.

(Doc. 6-6, Ex. 28, docket pp. 297-301) (footnotes omitted).

"[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession." *Jackson v. Denno*, 378 U.S. 368, 376 (1964). "The applicable standard for determining whether a confession is voluntary is whether, taking into consideration the totality of the circumstances, the statement is the product of the accused's free and rational choice." *Leon v. Wainwright*, 734 F.2d 770, 772 (11th Cir. 1984) (internal quotation marks omitted).

In determining whether the waiver of the privilege against self-incrimination is voluntary:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal

both an uncoerced choice and the requisite level of comprehension may
a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation omitted).

Mr. Millette raises no challenge to the validity of the *Miranda* warnings given to him. Nor does he contend he failed to understand the warnings. Rather, he claims his waiver was involuntary because the detectives told him they would not tell him what the investigation was about unless he first waived his *Miranda* rights, and therefore he responded to the detectives' questions only to attempt to discover what the investigation was about.

The state post-conviction court's denial of this claim was not objectively unreasonable. First, to the extent Mr. Millette is arguing he is entitled to relief because "[h]e never made an affirmative waiver of [his *Miranda*] rights" (Doc. 1, p. 25), the argument fails because there is no requirement to obtain an express waiver. *See Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) ("The prosecution therefore does not need to show that a waiver of *Miranda* rights was express. An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence.") (citation omitted).

Second, Mr. Millette has failed to allege or demonstrate trial counsel knew of any valid basis for seeking the suppression of his statement. Counsel cannot be deemed constitutionally ineffective in failing to move to suppress the statement if he did not know any basis for doing so. *See United States v. Fields*, 565 F.3d 290, 295 (5th

Cir.2009) ("Clairvoyance is not a required attribute of effective representation.").

Third, under the totality of the circumstances, Mr. Millette's waiver was voluntary, knowing, and intelligent. He admits the detectives read him his rights, and he understood those rights. He essentially argues he was coerced into waiving his rights because the detectives would not talk to him further about the nature of the investigation unless he first waived his rights. But "[s]ufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Adams*, 2021 WL 2325641, at *12 (N.D. Ga. Mar. 17, 2021), *report and recommendation adopted in part, rejected in part*, 2021 WL 1904680 (N.D. Ga. May 12, 2021) (citing *Colorado v. Connelly*, 479 U.S. 157, 163 n.1, (1986); *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988); *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984)). Mr. Millette alleges no facts indicating he was subjected to such coercive conduct. And he cites to no case law that suggests the detectives' refusal to explain the nature of their interrogation without Mr. Millette first waiving his *Miranda* rights was coercion that rendered his statement involuntary. Thus, trial counsel was not deficient in failing to move to suppress Mr. Millette's statement.

Fourth and finally, even if defense counsel's performance was deficient, Mr. Millette has failed to establish sufficient prejudice from counsel's failure to move to suppress Mr. Millette's statement. Considering the other circumstantial evidence of

Mr. Millette's guilt (his eviction from the motel, his argument with the victim, and the DNA evidence), he cannot show that had his statement been suppressed, there is a reasonable probability of a different outcome.

Mr. Millette has failed to show that the state court unreasonably applied *Strickland*. Accordingly, he is not entitled to habeas relief under Ground Seven.

**Ground Eight: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO ERRONEOUS JURY INSTRUCTIONS. THIS VIOLATED THE PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS GUARANTEED BY THE UNITED STATES CONSTITUTION. (PRECEDENT *STRICKLAND v. WASHINGTON*, 466 U.S. 668 (1984) (Doc. 1, pp. 28-29)**

Mr. Millette contends trial counsel was ineffective in failing to object to the jury instructions for Felony Murder-First Degree and Robbery as a principal. He argues the instructions should not have been given because they were unsupported by evidence. He asserts there was no evidence he either had a conscious intent to commit robbery or did something to incite Mr. Rogers to commit the robbery. And without evidence showing Mr. Millette was a principal to robbery, he argues, there was no factual basis to support the Felony Murder-First Degree instruction because the robbery was the predicate felony for the felony murder charge. He argues had counsel objected to the instructions, the objection would have been sustained, the

instructions would not have been given, and the result of the trial would have been different.

This claim was raised in state court in Ground Six of Mr. Millette's second amended Rule 3.850 motion (Doc. 6-6, Ex. 14, docket pp. 177-79). In denying the claim, the state post-conviction court stated:

> Defendant presents related claims in Grounds Six and Eight. He contends that counsel was ineffective for failing to object to the standard jury instruction regarding the definition of what constitutes a principal participant to robbery, a necessary element to finding Defendant guilty of Felony Murder in the First Degree, pursuant to § 782.04(l)(a), Fla. Stat. Defendant claims that because there was no evidence in the record that he had a "conscious intent to commit robbery," or that he "did an act or said a word to incite the co-defendant to commit the crime," there was no basis for the instruction. Moreover, because the evidence was lacking to support the robbery conviction, Defendant argues that counsel should have made more than a "boilerplate" motion for a judgment of acquittal and should have moved for a post-verdict judgment of acquittal. But for these errors, Defendant alleges that he could not have been convicted of Felony Murder in the First Degree as a matter of law.

> Defendant does not allege that the instructions regarding felony murder and principal participation were inaccurate statements of the law. Counsel cannot be ineffective for failing to correct an accurate instruction. *See Occhicone v. State*, 768 So. 2d 1037, 1044 (Fla. 2000) (finding that counsel could not be ineffective for failing to request a jury instruction when instructions as given were accurate). The record reveals that counsel actively participated in discussing the jury instructions, and that he argued to the trial court that there was insufficient evidence to support charging the jury that it could convict Defendant of murder by finding that he actually killed the victim. The court agreed, and this language was removed from the instruction. Counsel was not ineffective in this regard.

***

(Doc. 6-6, Ex. 28, docket pp. 303-05) (footnotes omitted).

Under Florida law, "a trial court errs when it gives an instruction that has no factual basis in the record[.]" *Masaka v. State*, 4 So. 3d 1274, 1284 (Fla. 2d DCA 2009) (citations omitted). "Thus, giving the principals instruction is error when there is no evidence that the defendant had a conscious intent that the crime be committed and did some act or said some word which was intended to and in fact did incite a third party to commit the crime with which the defendant is charged." *Id.* (citations omitted). It is not error to give the principal instruction where there was evidence the defendant acted in concert with another in committing the offense. *See Stephens v. State*, 302 So. 3d 416, 418 (Fla. 1st DCA 2019).

The state court did not err in giving the principal instruction because there was evidence that Mr. Millette acted in concert with Mr. Rogers in committing the robbery. A few days before the robbery and murder, the victim evicted Mr. Millette from the motel (Doc. 15-2, Ex. 29, docket pp. 59, 88-89). When Mr. Millette was leaving, he said he was going to get his money back (Id., docket p. 60). There was evidence a robbery was committed at the time the victim was killed because the victim's wallet was missing, and the drawers in which the motel's money was kept were open and missing money (Id., docket pp. 43-44). Mr. Millette's DNA was discovered on the duct tape that was used to bind the victim's mother at the time of the robbery, and Mr. Rogers' DNA was discovered under the fingernails of the victim and the door of the motel office (Doc. 6-5, Ex. 1, docket pp. 188-89). Finally,

51

Mr. Millette's own statement showed he knew Mr. Rogers (Doc. 15-2, Ex. 29, docket p. 89). Therefore, there was sufficient evidence to justify the principal instruction. Accordingly, trial counsel was not deficient in failing to object to the principal and felony murder instructions.

Mr. Millette has failed to show that the state courts' denial of this claim was contrary to or an unreasonable application of *Strickland* or based on an unreasonable application of the facts. Accordingly, he is not entitled to habeas relief under Ground Eight.

**Ground Nine: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE INTRODUCTION OF EVIDENCE ON THE GROUND OF RELEVANCE. THIS VIOLATED THE PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS GUARANTEED BY THE UNITED STATES CONSTITUTION. (PRECEDENT *STRICKLAND v. WASHINGTON*, 466 U.S. 668 (1984) (Doc. 1, pp. 31-32)**

Mr. Millette contends trial counsel was ineffective in failing to object to the testimony of the State's DNA expert, Ms. Lehman, regarding the test results from the "tank top" shirt taken from the victim's body. Ms. Lehman testified that two of the four areas on the tank top that were tested matched the victim's DNA but also included a "mixture" of DNA. However, she could not exclude Mr. Millette, Mr. Rogers, the victim, or the victim's mother as the source of the other DNA. When asked if the other DNA was consistent with Mr. Millette's DNA, she testified "I could not exclude him as being a possible source." Mr. Millette argues this

testimony was irrelevant because it "did not prove or disprove a material fact" and highly prejudicial because it suggested his DNA may have been on the tank top.

This claim was raised in state court in Ground Seven of Mr. Millette's second amended Rule 3.850 motion (Doc. 6-6, Ex. 14, docket pp. 179-81). There, he argued the expert's testimony was "irrelevant pursuant to Section 90.401, Florida Statutes." (Id., docket p. 179). In denying the claim, the state post-conviction court stated:

> As his seventh claim, Defendant contends that counsel was ineffective for failing to object to the testimony of Kristin Lehman, the State's DNA expert, regarding the testing results from the "tank top" shirt taken from Chester Jarosz's body. Ms. Lehman testified that she tested blood found on the shirt and was able to determine that two or more people contributed DNA to the mixture, but that she "could not exclude" Defendant, Benjamin Rogers, Chester Jarosz, or Anna Jarosz as possible contributors to the mixture. Defendant contends that this answer suggested that it was possible that Defendant contributed to the mixture and it confused the jury. Because DNA evidence was crucial to linking Defendant to the crime scene, Defendant claims the admission of this irrelevant testimony was reversible error.
>
> Defendant's claim is unsuccessful because the evidence was relevant and not unduly prejudicial, so that counsel cannot be faulted for failing to object to its admission. Lehman testified to the results for every one of the items submitted to her for testing. Regarding the shirt, she said that she could not determine who the wearer was, and that it could have come from Defendant, Rogers, Chester Jarosz or Anna Jarosz, or from "somebody else." This testimony did not erroneously suggest that Defendant was the source of the DNA. Moreover, even if this testimony should have been excluded, there is no reasonable probability that the result of Defendant's trial would have been different. *Strickland*, 466 U.S. at 694; *Spera*, 971 So. 2d at 757-58.
>
> For these reasons, Ground Seven shall be denied.

53

(Doc. 6-6, Ex. 28, docket pp. 306-07) (footnote omitted).

The state post-conviction court concluded, as a matter of state law, that the expert's testimony regarding the source of the DNA on the tank top "was relevant and not unduly prejudicial." This Court must defer to the state court's determination of these state-law issues. "It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'" *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1355 (11th Cir. 2005) (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)). *See also, Baxter v. Thomas*, 45 F.3d 1501, 1509 (11th Cir. 1985) (stating that federal habeas corpus is not the proper vehicle to correct evidentiary rulings).

Because the state post-conviction court concluded that the testimony was relevant and not unduly prejudicial under Florida law, defense counsel's failure to object to the testimony was not deficient performance. *See Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) (counsel was not ineffective in failing to object to exclude particular evidence under state law; the state court concluded, as a matter of state law, that the evidence was admissible and that an objection would have been overruled; the federal habeas court was required to defer to that state-law determination). And the state post-conviction court's determination that the testimony was not prejudicial is not objectively unreasonable. During cross-examination of Ms. Lehman, defense counsel clarified for the jury that Ms. Lehman was unable to determine whose blood was mixed with the victim's blood on the tank

54

top and unable to obtain an adequate DNA profile that could identify who

contributed to the mixture of blood (Doc. 6-5, Ex. 1, docket pp. 196-97).

Mr. Millette has failed to show that the state courts' denial of this claim

involved an unreasonable application of *Strickland* or was based on an unreasonable

determination of the facts. Accordingly, Ground Nine does not warrant federal

habeas relief.

**Ground Ten: TRIAL COUNSEL WAS INEFFECTIVE FOR ARGUING A BOILERPLATE JUDGMENT OF ACQUITTAL AND BY FAILING TO MOVE FOR A POST VERDICT JUDGMENT OF ACQUITTAL. THIS VIOLATED THE PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS GUARANTEED BY THE UNITED STATES CONSTITUTION. (PRECEDENT *STRICKLAND v. WASHINGTON*, 466 U.S. 668 (1984) (Doc. 1, pp. 34-35)**

Mr. Millette contends defense counsel was ineffective in failing to argue an

adequate motion for judgment of acquittal (JOA) and in failing to move for a post-

verdict JOA. He argues the trial court "would have been obligated to grant" the

motions had counsel argued the State failed to present sufficient evidence to refute

every reasonable hypothesis of innocence.

This claim was presented in state court in Ground Eight of Mr. Millette's

second amended Rule 3.850 motion (Doc. 6-6, Ex. 14, docket pp. 182-87). In

denying the claim, the state post-conviction court stated:

> Defendant presents related claims in Grounds Six and Eight. He
> contends that counsel was ineffective for failing to object to the standard
> jury instruction regarding the definition of what constitutes a principal
> participant to robbery, a necessary element to finding Defendant guilty
> of Felony Murder in the First Degree, pursuant to § 782.04(l)(a), Fla.

55

Stat. Defendant claims that because there was no evidence in the record that he had a "conscious intent to commit robbery," or that he "did an act or said a word to incite the co-defendant to commit the crime," there was no basis for the instruction. Moreover, because the evidence was lacking to support the robbery conviction, Defendant argues that counsel should have made more than a "boilerplate" motion for a judgment of acquittal and should have moved for a post-verdict judgment of acquittal. But for these errors, Defendant alleges that he could not have been convicted of Felony Murder in the First Degree as a matter of law.

***

To the extent that Defendant argues that the evidence was insufficient to support the murder charge, this type of challenge is an issue for direct appeal, and is not cognizable under Fla.R.Crim.P. 3.850. *Childers v. State*, 782 So. 2d 946, 947 (Fla. 4th DCA 2001); *Jones v. State*, 699 So. 2d 809 (Fla. 1st DCA 1997); *Williams v. State*, 642 So. 2d 67, 68 (Fla. 1st DCA 1994). Counsel preserved for appellate review the sufficiency of the evidence to support the felony murder charge by moving for a judgment of acquittal after the State completed its case, and renewing the motion after resting for the defense. In his first motion, counsel argued that the evidence was insufficient to support the robbery conviction underlying the felony murder charge because the State failed to prove that money had been taken from the crime scene.

Defendant challenges the adequacy of these motions, along with counsel's failure to renew and reargue the acquittal motion after the jury returned its verdicts. Had counsel pointed out that the State failed to prove that Defendant had a "conscious intent" to commit the robbery and that he "did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit and/or attempt to commit the crime," Defendant claims that he could not have been convicted as a principal, and the trial court would have directed entry of judgment of acquittal on the felony-murder count.

A motion for judgment of acquittal should "fully set forth the grounds on which it is based," Fla. R. Crim. P. 3.380(b), and arguments not presented may not be preserved on appeal. For this reason, a claim that counsel was ineffective for filing an inadequate motion for judgment of acquittal is a cognizable postconviction claim. *Neal v. State*,

56

854 So. 2d 666, 670 (Fla. 2d DCA 2003). However, where a defendant makes no showing that the motion would have had a likelihood of success, the defendant fails to present a facially sufficient claim of ineffective assistance of counsel. *Id.*

A review of the record indicates that, even if counsel presented the arguments set forth in Ground Eight, the motion for judgment of acquittal would not have been successful. A court should not grant a motion for judgment of acquittal if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt. *Mosley v. State*, 46 So. 3d 510, 526 (Fla. 2009) (quoting *Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002)). Where the evidence is entirely circumstantial, the evidence must also exclude the defendant's reasonable hypothesis of innocence. *Id.* A motion for judgment of acquittal should not be granted unless "there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law." *Williams v. State*, 967 So. 2d 735, 755 (Fla. 2007) (quoting *Gudinas v. State*, 693 So. 2d 953,962 (Fla.1997)).

The fact that Defendant's DNA was found at the Siesta Inn on two pieces of the duct tape used to bind one of the victims; that Defendant had engaged in a dispute with the murder victim four days prior to the murder and robbery; that Defendant and Benjamin Rogers knew each other by Defendant's own admission; and Rogers' DNA was found underneath the fingernails of the murder victim and on the door to the hotel office where the crimes occurred, provided sufficient evidence from which the jury could conclude that Defendant was a principal participant in the robbery of Czeslaw "Chester" Jarosz. This excluded any reasonable hypothesis of innocence, as the defense's theory at trial was that Defendant had touched the duct tape on a prior occasion and that Benjamin Rogers later, coincidentally, used that same tape to bind Anna Jarosz. In light of the evidence and defendant's theory of innocence, neither a more specific acquittal motion, nor a post-verdict motion for judgment of acquittal, would have been successful.

For these reasons, Grounds Six and Eight shall be denied.

(Doc. 6-6, Ex. 28, docket pp. 303-07).

The state post-conviction court found that had defense counsel moved for a JOA and argued the State did not prove the essential elements of the crimes and failed to provide competent evidence to exclude the reasonable hypothesis of innocence presented by the defense, the motion for a JOA still would have been denied. The state post-conviction court therefore concluded that Mr. Millette failed to show deficient performance and prejudice.

Whether the evidence presented in a state criminal trial is sufficient to establish the elements of the crime and exclude any reasonable hypothesis of innocence to withstand a judgment of acquittal is a matter of state law. *See Bucklon v. Crosby*, 2006 WL 2990449, at *3 (M.D. Fla. Oct. 19, 2006) (citing *Lynch v. State*, 293 So.2d 44, 45 (Fla.1974)) ("Under Florida law, the state trial court should not grant a motion for judgment of acquittal unless the evidence is such that no view in which the jury may lawfully take of it favorable to the opposite party can be sustained under the law."); *McClay v. Sec'y, Dep't of Corr.*, 2015 WL 2401480, at *6 (M.D. Fla. May 19, 2015) ("Petitioner's contention that the state court should have granted his motion for judgment of acquittal because the State's circumstantial evidence failed to contradict his reasonable hypothesis of innocence is a state law issue for which federal habeas corpus relief does not lie.") (footnotes omitted). This Court cannot reexamine the state court's determination of state-law questions.

The state post-conviction court therefore has answered the question of what would have happened had trial counsel moved for a JOA and presented the

arguments Mr. Millette contends counsel should have presented – the JOA would have been denied. Consequently, he has failed to establish deficient performance and prejudice. *See Callahan*, 427 F.3d at 932 (11th Cir. 2005) (Alabama Court of Criminal Appeals had already answered the question of what would have happened had counsel objected to the introduction of petitioner's statements based on state decisions; the objection would have been overruled; therefore, counsel was not ineffective for failing to make that objection).

Moreover, the state court's decision was not based on an unreasonable determination of the facts in light of the evidence at trial. The evidence showing Mr. Millette was evicted from the motel by the victim, argued with the victim over money, and said he was going to get his money back was circumstantial evidence of his "conscious intent" to commit the robbery. And the testimony showing Mr. Millette's DNA was on the duct tape was circumstantial evidence he committed an act (restraining the victim's mother) that encouraged and assisted Mr. Rogers in committing the robbery. Finally, the above evidence coupled with Ms. Lehman's testimony that Mr. Rogers' DNA was *not* found on the duct tape (Doc. 6-5, Ex. 1, docket p. 203) was competent evidence inconsistent with Mr. Millette's hypothesis that Mr. Rogers acted alone during the robbery and homicide, and Mr. Millette handled the duct tape some time before Mr. Rogers obtained the tape and used it during the robbery. *See State v. L.*, 559 So. 2d 187, 189 (Fla. 1989) ("The state is not required to 'rebut conclusively every possible variation' of events which could be

inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.") (footnote and citation omitted).

Mr. Millette has failed to show the state courts' denial of this claim involved an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts. Accordingly, Ground Ten warrants no relief.

Any claims not specifically addressed herein have been determined to be without merit.

Accordingly:

1. The Petition for Writ of Habeas Corpus (Doc. 1) is **DENIED**.

2. The **Clerk** must enter judgment against Mr. Millette and close this case.

3. This Court should grant an application for a Certificate of Appealability only if Mr. Millette makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). He cannot make this showing.[6] Accordingly, a

---

[6] Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts,

> The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue. . . .

Certificate of Appealability is **DENIED** in this case. And because Mr. Millette is not entitled to a Certificate of Appealability, he is not entitled to proceed on appeal *in forma pauperis*.

**ORDERED** in Tampa, Florida on September 17, 2021.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

Copies to:
Reynaldo Millette, *pro se*
Counsel of Record